**PETTUS OIL & REFINING CO. v. TABER.**

**No. 13073.**

Court of Civil Appeals of Texas. Dallas.

June 27, 1941.

Rehearing Denied Aug. 1, 1941.

Guthrie & Guthrie and Margaret A. Brand, all of Dallas, for appellant.

Taylor, Irwin & Irwin, of Dallas, for appellee.

LOONEY, Justice.

Pettus Oil & Refining Company, the appellant herein, sued Eugene Taber in an action of debt, to recover the amount due on a contract in writing, with Ranco Oil Corporation, for the purchase of an oil and gas lease on 160 acres of land situated in Live Oak County, Texas, the consideration stated being $1,600; $250 cash, and $1,350 to be paid upon completion of a test well to a depth of 5,300 feet. Appellant sued as assignee of the $1,350 obligation, alleging full compliance with the terms of the contract by Ranco Oil Corporation, the assignment of the claim to appellant, demand upon appellee for payment, and his refusal.

The most material facts were agreed upon in writing and, as the case largely turns on the facts set up in the agreed statement, the same will be set out in full. The contract involved is in the form of a letter written by appellee Taber, addressed to Ranco Oil Corporation, and accepted in writing by the latter, as follows: "December 11th, 1937. Ranco Oil Corporation, 1201 Gulf States Bldg., Dallas, Texas. Gentlemen: This will confirm our verbal agreement under the terms of which I agree to buy and you agree to sell me, One Hundred and Sixty (160) Acres of Oil and Gas Leases, covering the following described tracts, situated in Live Oak County, Texas, to-wit: West Quarter (W¼) of the most southerly quarter of Section No. 3, J. Poitevent Survey, Live Oak County, Texas, being a part of the Cook Ranch, designated on the 'Plat Map' as Tract #1, and containing 40 acres, more or less. Southwest Quarter (SW¼) of the northeast 160 acres squared tract, Section No. 52, J. I. Clare Survey, Live Oak County, Texas, being a part of the Cook Ranch, designated on the 'Plat Map' as Tract #2, and containing 40 acres more or less. West Quarter (W¼) of the most westerly squared 160 acre tract, Section No. 353, C.C.S.D. & R.G.N.G. RR Co. Survey, Live Oak County, Texas, being a part of the Cook Ranch, designated on the 'Plat Map' as Tract #3, and containing 40

acres, more or less. North Quarter (N¼) of the most westerly quarter, Section No. 1, J. Poitevent Survey, Live Oak County, Texas, being a part of the Cook Ranch, designated on the 'Plat Map' as Tract #4, and containing 40 acres, more or less. I agree to pay, as consideration for these leases, the sum of One Thousand Six Hundred ($1,600.00) Dollars; payable on the following bases: Two Hundred and Fifty ($250.00) Dollars cash. The balance of One Thousand Three Hundred and Fifty ($1,350.00) Dollars, to be paid you upon the completion of a test well to a depth of 5,300 feet, or the Yegua Sand, unless oil and/or gas in commercial quantities, is encountered at a lesser depth. In that event, the balance becomes due and payable. It is understood and agreed that upon the completion of this test well, to the depth or depths above specified, or the Yegua Sand, you will furnish me with the following: 1. Photostat Copy of the Original Oil and Gas Lease. 2. Exact copy of a Schlumberger log, if any, of the well. 3. Copy of the Driller's Log. 4. Paleontological determinations, if any are available. It is also understood and agreed that the assignments are to be the regular Texas Standard Form No. 86, properly executed. This clause is your authority to assign or reassign this purchase letter to whomsoever you may designate without further written consent from me." This letter was signed by Eugene Taber and accepted in writing by Ranco Oil Corporation.

It was further stipulated that an oil well was drilled to a depth of 5,314 feet, without discovering oil, and was abandoned; that Ranco Oil Corporation, for a valuable consideration, assigned all its right under the contract with Taber to the appellant, and that appellant and Ranco Oil Corporation tendered to appellee all the instruments referred to in the agreement heretofore set out, which he refused to accept; and on January 20, 1938, the appellant made due demand upon appellee for payment of the balance due upon the contract, that is, $1,350; which demand was refused.

■ Appellant sought judgment for $1,350, with six per cent interest per annum thereon, from January 20, 1938, the date of the demand and refusal. At the conclusion of the evidence, a jury having been waived, the court rendered judgment in favor of the appellee; that is, that the appellant take nothing, from which this appeal was prosecuted. As findings and conclusions were not filed by the court, we must assume that, as basis for the judgment rendered, one or more of the defenses urged by the appellee were sustained. These defenses were: (1) That the instrument sued upon was unilateral and lacking in mutuality, in that, it was not made obligatory, either upon Ranco Oil Corporation or the appellant, to drill a test well, or to do or perform any other act; (2) that the instrument involved was insufficient to support an action for specific performance, in that, neither the acreage upon which the test well should be drilled, nor the survey, the county, the state, or the nation, was designated; (3) that the contract, as evidenced by the written instrument, was violative of the Statute of Frauds, in that, the terms and provisions of the contemplated conveyance or assignment of the lease were unknown, and the rights, interest, and liabilities to accrue to, or be incurred by, the assignee are not designated; and (4) there existed no privity of contract between the appellant and appellee.

■ These contentions will be discussed in the order named. We are of opinion that, even if it be assumed the drilling of a test well was optional with Ranco Oil Corporation, yet, having drilled the well as stipulated, rendered the contract binding and enforceable. This view of the matter, in our opinion, is fully sustained by the authorities. 10 Tex.Jur., pp. 171, 172, Sec. 100, states the rule in regard to the effect of performance in similar contracts, as follows: "Want of mutuality is no defense to the enforcement of an executed contract; and a party cannot successfully plead unilateralness in a contract which he has performed in whole or in part. Nor can a party who has actually received the consideration for a contract escape liability for breach of its covenants on the ground that it did not bind the opposite party to perform, where the latter has actually performed. (Though a contract is lacking in mutuality when it is made and while it is wholly executory, performance in whole or in part by the promisee supplies a consideration on his part, and renders the contract binding upon and enforceable against the other party.) * * *." To the same effect, see Stanley v. Sumrell, Tex.Civ.

App., 163 S.W. 697, 700, and Big Four Ice, etc., Co. v. Williams, Tex.Civ.App., 9 S.W. 2d 177, writ refused.

As the test well was drilled and completed according to the terms of the contract, we think appellant was entitled to recover the amount sued for, as against the contention that the acreage upon which the well should be drilled was not stated. The 160-acre oil and gas lease mentioned in the contract was a part of 4,947 acres leased by H. R. Randall to Ranco Oil Corporation, being "the original oil and gas lease" referred to in the contract, of which, obviously, appellee was cognizant at the time the contract was entered into. It was contemplated, we think, that the "test well" mentioned in the contract would be drilled, as subsequently it was drilled, on the acreage described in the "original oil and gas lease," of which the 160 acres constituted a part. Appellee admitted that, at the time the contract was entered into, he was shown the "plat map" of the property, and that during the time the well was being drilled, he made inquiries as to its progress, and attempted to dispose of the acreage contracted for. Thornton, in his work on The Law of Oil and Gas, 3rd Ed., p. 196, Sec. 123; also 5th Ed., p. 350, Sec. 199, says that: "The name 'test well' is practically its own definition, or at least suggests its meaning. It is a well put down on the leased premises to determine whether or not oil or gas exists thereon, and usually whether it exists in paying quantities * * *."

Appellee's main contention, and obviously the one sustained by the trial court, was that the executory contract under consideration did not meet the requirements of the Statute of Frauds, in that, it failed, by recitals or by reference to other writings or memoranda to describe the subject matter of the contract.

Whether or not the contract complied with the Statute of Frauds, Vernon's Ann. Civ.St. art. 3995, necessarily, must be tested by the same rule applicable to a similar contract for the sale and conveyance of land. In the early case of Johnson v. Granger, 51 Tex. 42, the Supreme Court, speaking through Judge Bonner, said: "First. The object of the statute requiring the sale of lands to be evidenced by an agreement or some memorandum thereof in writing * * * 'for the prevention of frauds and perjuries,' this memorandum should be so reasonably definite and certain within itself, or by other writing, referred to, that the contract can be made out, as to parties, consideration, and subject-matter, without a resort to parol evidence. It should be so certain that a specific performance of it can be enforced. (Peters v. Phillips, 19 Tex. [70], 74 [70 Am.Dec. 319]; Barickman v. Kuykendall, 6 Blackf. [Ind.] 21; Ellis v. Deadman's Heirs, 4 Bibb [Ky. 466], 467; Kay v. Curd, 6 B.Mon. [Ky.] 100.)" This doctrine was reaffirmed by the Galveston Court of Civil Appeals in the recent case of Walker, etc., Co. v. Alaskan Fur Co., 131 S.W.2d 196, writ refused, and in 20 Tex.Jur., pp. 312, 314, Sec. 103, it is said that: "A transaction affecting real property must be evidenced by a writing which contains a sufficiently definite description to make possible an identification of the land with reasonable certainty without resort to oral testimony. The writing must furnish in itself, or by reference to some writing, the means or data by which the particular land to be conveyed can be identified. According to a general principle, however, that is certain which is susceptible of being made certain. While oral testimony is not admissible to prove the terms of a contract which the parties have put in writing, such evidence is admissible to apply the terms of the contract to the subject-matter—that is to say, to identify the subject matter where the contract itself furnishes the key to identification. * * *."

The contract under consideration, in our opinion, met these tests, and should be enforced. The contracting parties and the consideration are absolutely certain, and we think the subject matter, that is, the assignment of an oil and gas lease on 160 acres of land, is also certain, or capable of being rendered so without having to resort to parol evidence. The descriptive recitals of the contract, and the "plat map" and the "original oil and gas lease" referred to, render the subject matter certain, or susceptible of being made certain. The contract recites that the lands involved are located in Live Oak County, Texas, part of the "Cook Ranch"; the names and numbers of the original survey were stated; also, the 40-acre tracts were designated on the "plat map" mentioned as "Tract #1, Tract #2, Tract #3 and Tract #4." Appellee testified that he had the "plat map" before him at the time the contract was entered into, which indicates the larger body

of land, within which are located the four 40-acre tracts platted as parallelograms and numbered, tract #1, tract #2, tract #3 and tract #4; and the original lease, under which the assignor held title, referred to in the contract, it being stipulated that, at the completion of the test well, a "photostat copy" of same should be furnished appellee. A photostat copy was tendered appellee when the test well was completed, which shows that on June 2, 1937, H. R. Randall, as owner, leased to Ranco Oil Corporation a number of tracts of land in Live Oak County, Texas, aggregating 4,947 acres, containing a detailed description, by metes and bounds, of each of the tracts included in the lease, and was recorded in the office of the County Clerk of Live Oak County on June 15, 1937. So, we are of opinion that, by recitals and by reference to the "plat map" and to the original lease, the contract satisfied the requirements of the statute, in that, as said by the Supreme Court, in Johnson v. Granger, supra, it contained the names of the contracting parties, the consideration, and by recitals and reference to other documents, rendered the description of the subject-matter either certain, or susceptible of being rendered certain. Appellee insists, however, that the contract was not enforceable, because of the inadequacy of the description of the subject matter, in that, the terms and provisions of the original lease, under which Ranco Oil Corporation held, were not set out in the contract, or made certain by reference to any other document. We do not think it was essential to the enforceability of the executory contract for the assignment of the oil and gas lease, that it contain the terms and provisions of the original lease under which the assignor held, for, unless stipulated to the contrary, the assignment would be taken subject to the conditions and provisions of the original lease, whether stated in the assignment or not—this, as a matter of law.

Appellee cites the case of Cantrell v. Garrard, Tex.Com.App., 240 S.W. 533, 534. There is language in this opinion which seemingly supports appellee's contention. The able Judge who wrote the opinion for Commission A, among other things, said: "A contract for the sale or conveyance of the lease under consideration was required by our statutes to be in writing. R.S. arts. 1103 and 3965 [Vernon's Ann.Civ.St. arts. 1288, 3995]. The lease itself constituted the subject-matter of the contract. The land upon which the lease was given was one of the essential elements of description, but not by any means the only one. The term for which the lease was to run, the time for beginning drilling operations, the time and amount of payments in lieu of drilling operations, and the amount to be paid for gas produced, were also essential elements of description." We have examined each of the Texas cases cited in the opinion, and respectfully suggest that neither is in point. It seems that each involved a contract for the sale of land, held unenforceable because of insufficient description of the land involved.

Another case cited by appellee is that of Sneed v. Lester, Tex.Civ.App., 76 S.W.2d 802, which involved a contract for the sale of an oil and gas lease. The court held that the imperfect description could not be aided by parol evidence, to the effect that at the time the contract was entered into, a map and an abstract of title were exhibited, showing the exact location of the land and a description of the lease. That case, we think, is easily distinguishable from the case at bar, in that, the agreement made no reference to the plat or abstract in regard to which parol evidence was offered, whereas, in the instant case, the contract referred to the "plat map" and to the "original oil and gas lease."

Another case cited by appellee is that of Fagg v. Texas Co., Tex.Com.App., 57 S.W. 2d 87. We think this case is also distinguishable from the one at bar, in that, it involved a contract for lease of land, and not, as in the instant case, for the assignment of an existing lease. The court held that the character, extent, and duration of the rights to oil and gas in place, which the proposed lessor was supposed to acquire, constituted an essential part of the subject matter of the contract. That case presented an entirely different proposition from the one under discussion.

We find no authority for the doctrine announced in Cantrell v. Garrard, supra, to the effect that it is essential to a proper description of the subject matter of an executory contract for the assignment of an existing oil and gas lease, to reproduce or set forth its terms and provisions; nor do we think there exists any good reason for such requirement, because the assignee would take subject to the terms and provisions of the original lease, as a matter of law, whether mentioned or not. But aside from the question whether or not the contract, in all respects, complied with the

Statute of Frauds, we are of opinion that, in view of complete performance by Ranco Oil Corporation, the contract was no longer affected by the Statute of Frauds. Our statute does not declare such a contract to be illegal or void; its validity is presumed; but the right to enforce same through judicial procedure is suspended until its provisions are satisfied, or performance removes it entirely from the operation of the statute. See 20 T.J., Sec. 53, p. 262. The record discloses that the test well provided for in the contract was drilled to the required depth, from which appellee benefited by having the acreage, under contract to him, tested, and was afforded an opportunity to make profitable sales, which he attempted to consummate; and, on completion of the well, the documents called for in the contract, including an assignment of the oil and gas lease to 160 acres, on Texas Standard Form No. 86, duly executed, were tendered appellee, which he declined to accept.

In Southern Bldg., etc., Ass'n v. Jackson, Tex.Civ.App., 290 S.W. 266, 268, this Court, speaking through our lamented late Chief Justice Jones, said: "Assuming that the oral agreement of January 2, 1922, was obnoxious to this statute when it was entered into, yet after appellee had performed all that the agreement contemplated that he should perform and appellant had received the entire benefit of appellee's performance, can said statute now be invoked to relieve appellant from the performance of his part of the contract by the execution of the release? We do not think so. As we understand the law, if an agreement when first made comes within the purview of subdivision 4, art. 3995, that statute has no application, after one party to the agreement has fully performed the obligations imposed upon him by the terms of such agreement and the other party has received and is enjoying the benefits of such performance. Belcher v. Schmidt, 62 Tex.Civ. App. 411, 132 S.W. 833; Showalter v. McDonnell, 83 Tex. 158, 18 S.W. 491." Also, see 20 T.J., Sec. 112, pp. 322, 323, and 31 T.J., Sec. 257, pp. 946, 948.

█ It was also pleaded as a defense that no privity existed between Pettus Oil & Refining Company and the appellee. As privity denotes mutual or successive relationship to the same right of property (see 50 C.J., pp. 404, 405), we agree that no privity existed between the appellant and

appellee; but that fact would not adversely affect appellant in this litigation. If, however, appellee's real contention was that, no privity existed between Ranco Oil Corporation, assignor of the claim, and appellant, the assignee, the answer is quite simple, as the claim was an assignable one, but aside from that, the concluding paragraph of appellee's contract provided that: "This clause is your (Ranco Oil Corporation's) authority to assign or reassign this purchase letter to whomsoever you may designate without further written consent from me."

█ Appellee also contends that appellant should not be permitted to recover because he failed to allege or prove good and merchantable title to the 160-acre lease, or ability to perform the executory contract. We think this was defensive matter and, as appellee did not plead defective title as a defense to the action, but relied exclusively upon the grounds heretofore discussed, the issue in regard to title was waived. See Stroburg v. Walsh, Tex.Civ.App., 203 S.W. 391, 394, and 38 T.J., Sec. 88, p. 776.

In harmony with the conclusions reached, the judgment below is reversed, and judgment here rendered for the appellant, Pettus Oil & Refining Company, against the appellee, Eugene Taber, for the principal sum of $1,350, with interest thereon at the rate of six per cent per annum from January 20, 1938, and all costs of suit, for which, appellant may have execution.

Reversed and rendered.

### On Rehearing.

In the original opinion, among other things, we said: "* * * that during the time the [test] well was being drilled, he [appellee] made inquiries as to its progress, and attempted to dispose of the acreage contracted for." And, at another place, we said: "The record discloses that the test well provided for in the contract was drilled to the required depth, from which appellee benefited by having the acreage, under contract to him, tested, and was afforded an opportunity to make profitable sales, which he attempted to consummate; * * *."

The accuracy of these statements is challenged in the motion for rehearing, appellee contending that his testimony goes no further than to show only one occasion when he said to a third party that he was interested in selling some oil leases; that

706

no affirmative step or act was taken by appellee which could lead to the conclusion that he ever accepted any rights under the written instrument or attempted to convey any right, title or interest in the lands involved; and, at another place in the motion for rehearing, appellee states: "The undisputed evidence shows that appellee never * * * attempted to sell or convey any rights to oil and gas in place," etc.

Although we deem the matter mentioned purely evidentiary and not vital to any controlling issue, yet, as the accuracy of our statements has been challenged, we will reproduce appellee's testimony, from which our conclusions were drawn. He testified in substance that his friend, Mr. M. P. Wilson, first suggested that they go in fifty-fifty and acquire the acreage in question; that he (appellee) would be notified as the test well progressed; that they would have plenty of time, and "We will sell this stuff off as my friend notifies me and the hole (test well) goes down, and we will sell this stuff off and you wont be out but your $250 (cash payment made)." To this, appellee answered, "Well, that's all right"; and that, within two or three weeks after signing the contract, he 'phoned his friend Wilson to ascertain "how the hole (test well) was coming on"; who said, "It's coming along very fair." "I says 'Well, what about it? Have you sold anything or had any offer?' he says 'No,' but he had a letter from the Magnolia Petroleum Company where they wanted to buy some acreage, but they didn't want any majors in on it, and I says 'Well, I will come over to your office' and I went over to the office." After seeing the letter, appellee proceeds with his testimony: "So I says 'Well, that seems to be all right; the hole (test well) seems to be progressing—get in and sell it.' He (meaning Wilson) says 'all right' and says 'Have you got any friend you want to sell it to?' and I says 'No, I haven't got any friends'—I wasn't in on that deal at all to sell it." Wilson said "Well, he would try to see what he could do, and the first thing

I knew, the darned hole (test well) was finished and some attorney 'phoned up to me and said they had a draft for me to pay. I said 'Well you get hold of Mr. M. P. Wilson and take that up with Mr. Wilson about that draft.' I says 'For the love of Mike! It looks like you bored that hole (test well) overnight.'" Appellee testified further that he figured it would take several months to drill a 5,000-foot well; that when Wilson showed him the Magnolia Company letter, appellee said "Well, I will just sell some of the stuff." Again he said, "I never expected to pay another penny (meaning in addition to the cash payment of $250), because Wilson told me emphatically that he could sell it."; testified further that, during the progress of the drilling, he 'phoned once or twice for information in regard to the matter; was asked "Well, why didn't you go ahead and sell some of that land to Magnolia? A. Well, I couldn't answer that; it seems to me that well got down so quick I couldn't negotiate with them or Wilson."

We think it perfectly obvious, from appellee's own testimony, that he thought it would take several months to drill the test well to the depth required, and that, in the meantime, through his friend and associate, Mr. Wilson, profitable sales could be made of the acreage, enabling him to pay off the note from proceeds of the sales. However, the well was finished sooner than expected, and was a disappointment. Appellee expressed his disappointment and chagrin by statements that the first thing he knew, "the darned hole was finished" and when an attorney demanded payment of the note, among other things, said, "For the love of Mike! It looks like you bored that hole overnight."

We do not think the statements challenged by appellee were overdrawn, but fully sustained by plaintiff's testimony set out above. We have duly considered all grounds set up in the motion for rehearing and, finding same without merit, the motion is overruled.